UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

TERRENCE A. MCKNIGHT,

         Petitioner,

      v.

R. JOHNSON,

         Respondent.

Case No. 18-cv-01036-VC (PR)

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; GRANTING, IN PART, CERTIFICATE OF APPEALABILITY**

Terrence A. McKnight filed a pro se petition for a writ of habeas corpus challenging the validity of his state criminal conviction. On August 9, 2018, the respondent filed a memorandum of points and authorities in response to the order to show cause. McKnight's traverse was due on September 10, 2018. McKnight filed several motions for an extension of time, which the court granted. On January 22, 2019, McKnight filed a motion for appointment of counsel claiming he was being denied access to the prison law library. On February 6, 2019, the court issued an order denying the motion to appoint counsel but directed respondent's counsel to ensure McKnight had adequate access to the prison law library. The court stated it would entertain a further motion for an extension of time from McKnight if he needed more time to research materials in the law library. On February 8, 2019, the respondent filed a notification he was in compliance with the court's order, attaching a declaration from the senior law librarian stating McKnight had "PLU" status, meaning he could use the law library up to four hours per week. McKnight filed no further motions for an extension of time and has not filed a traverse. Therefore, the court reviews McKnight's claims based on his petition and the respondent's memorandum. The petition is denied, but a certificate of appealability is granted, in part.

# PROCEDURAL BACKGROUND

On March 8, 2013, a jury found McKnight guilty of the May 17, 2002 first degree murder of 13-year old Keith Frazier and the attempted murder of Kevin Wortham and found the firearm allegations to be true. 2 Clerk's Transcript ("CT") 406-09; ECF No. 20-3 at 416-19. The court sentenced McKnight to 70 years to life in prison. 3 CT 710; ECF No. 20-4 at 228.

On October 20, 2016, the California Court of Appeal affirmed the judgment in a written opinion. *People v. McKnight*, 2016 WL 6124497 (Cal. Ct. App. Oct. 20, 2016) (unpublished). On January 11, 2017, the California Supreme Court denied McKnight's petition for review. Ex. 9. McKnight filed this timely federal petition.

# BACKGROUND

Three eyewitnesses testified at McKnight's trial: Kevin Wortham, Eric Hoskins and Krystal Willingham. The Court of Appeal described their testimony as follows:

### Kevin Wortham

On the afternoon of May 17, 2002, Wortham drove his approximately thirteen-year-old brother, Frazier, and his three-or four-year-old sister, Erica, to the Alemany housing project where they lived with their mother. Frazier was sitting in the front passenger seat and Erica was sitting behind Frazier. Wortham stopped to talk with Eric Hoskins, Erica's father, then drove a short distance up the street and parked. He started to open his door when a man began firing gunshots into the car. Wortham looked up and saw the shooter running away. The shooter was wearing black clothing and a ski mask covering his face.

Hoskins ran up to the car and Wortham told him he thought the shooter was "Tee Baby." It was undisputed at trial that appellant's nickname was Tee Baby. Wortham met appellant about three or four months before the shooting and they occasionally played basketball or Playstation together. Wortham recognized appellant by his build, gait, and clothing.

Wortham watched as Hoskins chased the shooter uphill. After running some distance, the shooter removed his ski mask. Wortham could see the shooter's face and recognized appellant. Hoskins appeared to be too tired to continue pursuing appellant and he returned to the car; appellant ran away. Frazier had been shot in the head and died; a bullet had grazed Wortham's stomach.

Wortham told a police officer who arrived on the scene that he did not know who the shooter was. He did not identify appellant to the

officer because he was "full of anger" and "thought about taking actions into my own hands." During an ambulance ride taking Wortham to the hospital, he spoke to his mother on the phone and told her Tee Baby shot Frazier. FN3 When Wortham spoke to police officers at the hospital later that day, he told them Tee Baby was the shooter. FN4 Two days later, Wortham identified appellant in a photographic lineup.

FN3 A police officer accompanying appellant in the ambulance testified she overheard Wortham, while on his cell phone, say "Tee Baby did this."

FN4 Audio recordings of this interview, as well as a May 20, 2002 interview with Wortham, were played for the jury.

On cross-examination, Wortham admitted making false or inconsistent statements about the shooting. Wortham testified at the preliminary hearing that he saw a man named Andre Glaser with appellant at the time of the shooting. At trial, Wortham conceded this preliminary hearing testimony was false and based on a rumor that Andre Glaser and appellant wanted to kill him. Wortham did not tell investigators the shooter was wearing a mask until 2011. Wortham testified at the preliminary hearing that the shooter had been wearing gray sweats; at trial he testified the shooter's clothing was all black. In one of his 2002 police interviews, Wortham identified the shooter's location in a place the prosecution's trajectory expert testified was not possible in light of forensic trajectory evidence.

**Eric Hoskins**

Eric Hoskins is Wortham's godfather and Erica's father. On the day of the shooting, he started detailing cars around 9:00 a.m. He saw appellant driving up and down the street. Hoskins knew appellant: about three months before the shooting he began seeing appellant in the neighborhood, and appellant had come to Hoskins's house to see Wortham. About 15 minutes before the shooting, appellant and two other men—whom Hoskins knew as "Younger Dave" and "Taco"—approached Hoskins. Younger Dave started saying something "crazy" to Hoskins and appellant walked around appearing to come behind Hoskins. Taco broke up the confrontation and the three men drove up the street, parking nearby.

Shortly thereafter, Wortham drove up. After Hoskins and Wortham talked, Wortham drove forward about 30 yards and parked. Hoskins had returned to work when an acquaintance, Kevin Martin, cried out that there was a shooting. Hoskins saw a man firing gunshots at Wortham's car from a few feet away. The man was dressed in all black with a ski mask covering his face. Hoskins ran toward the car; the shooter stopped firing and ran up the street. When Hoskins reached the car, Wortham told him the shooter was Tee Baby.

Hoskins ran after the shooter, up a hill. When the shooter reached the top of the hill, about 50 feet away from Hoskins, he took off his ski mask. Hoskins recognized the shooter as appellant. Hoskins was too tired to continue his pursuit and returned to Wortham's car. . . .

Hoskins did not talk to the police about the shooting until November 2002, when police contacted him after learning he was in a vacant home. FN5 He testified he did not talk to the police earlier because he "wanted to take the law into my own hands." On cross-examination, Hoskins admitted prior false or inconsistent statements about the shooting. In November 2002, he told the police appellant got into a car after running up the hill, but at trial he said the basis of the statement was "street [ ] talk." He gave the police a conflicting account of his encounter with appellant, Younger Dave, and Taco prior to the shooting. He told police that he saw Taco's car driving up the hill before the shooting, but at trial testified he did not. He never told anyone prior to 2011 that he had been talking to Martin at the time of the shooting.

FN5 An audio recording of Hoskins's November 2002 interview was admitted into evidence.

Hoskins admitted prior felony convictions for residential burglary in 2004 and possession of an assault rifle in 2006, and admitted lying to the police about his identity in 1997.

**Krystal Willingham**

Willingham was a reluctant witness who testified at trial she had no memory of the shooting. In an interview with police on May 30, 2002, Willingham said she saw the shooting and identified appellant as the shooter in a photographic lineup. FN6 She told the police that, while she did not know appellant's name, she had seen him before at her neighbor's house. Willingham's preliminary hearing testimony was inconsistent with certain aspects of Wortham's and Hoskins's testimony: she testified at the preliminary hearing that the shooter was not wearing a mask, Frazier was outside the car when he was shot, FN7 appellant left in a car right after the shooting, and she did not see anyone chasing appellant's car as it drove away.

FN6 An audio recording of Willingham's police interview was played for the jury.

FN7 The parties stipulated that Frazier was inside the car when shot.

*People v. McKnight*, 2016 WL 6124497, at *1-2.

Jason Glaser, a member of a group known as the Freeway Boys, was killed a few days before the shooting of Wortham and Frazier. *Id.* at *3. Wortham testified that he was a member of a group called the Project Boys and McKnight was a member of the Freeway Boys. *Id.*

Wortham testified he was warned that other Freeway Boys believed he was involved in Glaser's murder and Wortham's family was worried about his safety. *Id.* Witnesses testified that, after the shooting of Wortham and Frazier, it appeared that McKnight left the area. *Id.* McKnight was in custody in Texas in June 2003. *Id.*

## STANDARD OF REVIEW

A federal court may entertain a habeas petition from a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Under the Antiterrorism and Effective Death Penalty Act, ("AEDPA"), a district court may not grant habeas relief unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *Williams v. Taylor*, 529 U.S. 362, 412 (2000). This is a highly deferential standard for evaluating state court rulings: "As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011). Additionally, habeas relief is warranted only if the constitutional error at issue "'had substantial and injurious effect or influence in determining the jury's verdict.'" *Penry v. Johnson*, 532 U.S. 782, 795 (2001) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)).

## DISCUSSION

### I. Admission of Evidence

McKnight argues the admission of a police broadcast identifying him as the shooter by unknown people violated his Confrontation rights under the Sixth and Fourteenth Amendments.

#### A. Relevant Background

Prior to trial, defense counsel moved to exclude testimony from officers about the

broadcast describing the identity of the shooter provided to them at the crime scene by unknown people, arguing it was inadmissible hearsay.  The prosecutor argued the evidence was admissible to show the effect on the officers' state of mind and the trial court admitted it for that limited purpose.  The Court of Appeal described the testimony as follows:

> Four police officers who responded to the shootings testified at trial.  When the officers arrived at the scene, a crowd of onlookers had gathered and the officers asked for help identifying the shooter.  Within minutes of the officers' arrival on the scene, multiple police radio broadcasts issued information about the shooter.  One of these radio broadcasts identified the shooter as follows: "Black male, 5'11", all black clothing, goes by Tee Baby."  None of the officers could remember talking to a specific person who provided the identifying information, but they testified the information must have come from one or more persons at the scene.  The trial court admonished the jurors that the descriptions of the suspect "are being offered only for state of mind of the officers and what happened next, . . . not for the truth of what's in those statements."

*McKnight*, 2016 WL 6124497, at *4.

The California Court of Appeal determined the admission of the hearsay testimony was in error because the non-hearsay purpose for which it was admitted had no relevance to the case, but denied the claim because the admission of the testimony was not prejudicial.  *McKnight*, 2016 WL 6124497, at *5, 7-8.  It also held the Confrontation Clause did not apply because the challenged statements were nontestimonial.  *Id.* at *6-7.

**B. Confrontation Clause**

McKnight argues the Court of Appeal was wrong because the police broadcasts based on statements from unidentified people were testimonial.

The Confrontation Clause of the Sixth Amendment provides that, in criminal cases, the accused has the right to "be confronted with the witnesses against him."  U.S. Const. amend. VI.  The goal of the Confrontation Clause is to ensure reliability of evidence, but it is a procedural rather than a substantive guarantee.  *Crawford v. Washington*, 541 U.S. 36, 61 (2004).  It commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination.  *Id.*  The Confrontation Clause only applies to

"testimonial" statements. *Id.* at 50-51. "Testimony . . . is typically a solemn declaration or affirmation made for the purpose of establishing or proving some fact." *Id.* at 51. It applies not only to in-court testimony but also to out-of-court statements introduced at trial, regardless of the admissibility of the statements under state laws of evidence. *Id.* at 50-51.

When the primary purpose of an out-of-court statement is to create an out-of-court substitute for trial testimony, the statement is testimonial hearsay and *Crawford* applies. *Michigan v. Bryant*, 562 U.S. 344, 358 (2011). The formality of the interrogation, or the lack of it, may inform the court's inquiry as to its "primary purpose." *Id.* at 366. The primary purpose of a statement is determined objectively. *United States v. Rojas-Pedroza*, 716 F.3d 1253, 1267 (9th Cir. 2013). Thus, "the relevant inquiry is not the subjective or actual purpose of the individuals involved in a particular encounter, but rather the purpose that reasonable participants would have had, as ascertained from the individuals' statements and actions and the circumstances in which the encounter occurred." *Id.* (quoting *Bryant*, 562 U.S. at 360).

An important factor in determining the primary purpose of a police interrogation is whether an "ongoing emergency" existed at the time. *Bryant*, 562 U.S. at 366. "Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency." *Davis v. Washington*, 547 U.S. 813, 822 (2006); *see id.* at 821-23, 826-29 (holding a victim's initial statements in response to a 911 operator's interrogation were not testimonial because the elicited statements, i.e., naming her assailant, were necessary to resolve the present emergency); *see also Ohio v. Clark*, 135 S. Ct. 2173, 2181 (2015) (teachers' questions and a 3-year-old's answers about his injuries were not testimonial because they were "primarily aimed at identifying and ending the threat" to the child rather than for the primary purpose of gathering evidence for a later prosecution).

The officers responding to the shooting of Frazier and Wortham were confronted with a situation like that in *Bryant*, where the police found a victim suffering from a fatal gunshot wound and a perpetrator whose location was unknown. *Bryant*, 562 U.S. at 359. In *Bryant*, the

Supreme Court found these circumstances created a potential threat to the responding police and the public, which constituted an ongoing emergency. It explained the significance of an ongoing emergency as follows:

> the existence of an ongoing emergency is relevant to determining the primary purpose of the interrogation because an emergency focuses the participants on something other than proving past events potentially relevant to later criminal prosecution. . . . Rather, it focuses them on ending the threatening situation. . . because the prospect of fabrication in statements given for the primary purpose of resolving that emergency is presumably significantly diminished, the Confrontation Clause does not require such statements to be subject to the crucible of cross-examination.

*Id.* at 361.

The Court held the victim's statements to the police about the identification and description of the shooter and the location of the shooting were not testimonial and the Confrontation Clause did not bar their admission at Bryant's trial. *Id.* at 378.

Here, the police were confronted with two shootings, and the shooter, most likely armed with a gun, was at large in the community, creating a threat to the public and the responding officers. The identification statements given to the police were not made during a police interrogation at the police station, but in a public location. The crime scene was likely chaotic, and the police could not even identify the people who made the statements. *See id.* at 360 (the circumstances in which an encounter occurs—e.g. at or near the scene of the crime versus a police station—are matters of objective fact to consider). An objective consideration of the individuals' statements and the circumstances in which they occurred leads to the conclusion that they were made to end the ongoing emergency and not made to prove past events at a trial. Therefore, the statements were non-testimonial, and their admission did not violate the Confrontation Clause.

In his petition, McKnight attempts to distinguish the Supreme Court cases from his case. For instance, he argues *Bryant* limited its holding to a dying declaration of the gunshot victim and *Davis* was limited to an excited utterance on a 911 recording. However, an ongoing emergency is objectively determined by the surrounding circumstances and whether the

statements are given to end a threat to the public or the police, rather than the subjective state-of-mind of the declarant. In this case, the circumstances clearly show the statements were given to the police to end the ongoing emergency caused by a shooter being at large in the neighborhood.

## C. Admission of Prejudicial Testimony

### 1. Federal Authority

The admission of evidence is not subject to federal habeas review unless a specific constitutional guarantee is violated, or the error is of such magnitude that the result is a denial of the fundamentally fair trial guaranteed by due process. *Henry v. Kernan*, 197 F.3d 1021, 1031 (9th Cir. 1999). The Supreme Court "has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ." *Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009) (finding that trial court's admission of irrelevant pornographic materials was "fundamentally unfair" under Ninth Circuit precedent but not contrary to, or an unreasonable application of, clearly established Supreme Court precedent under § 2254(d)). Failure to comply with state rules of evidence is neither a necessary nor a sufficient basis for granting federal habeas relief on due process grounds. *Henry*, 197 F.3d at 1031; *Jammal v. Van de Kamp*, 926 F.2d 918, 919 (9th Cir. 1991). Only if there are no permissible inferences that the jury may draw from the evidence can its admission violate due process. *Id.* at 920.

### 2. Identification of Shooter by Unidentified People

McKnight argues that, even if the statements about the identity of the shooter are not testimonial, their admission violated his right to a fair trial. The respondent argues this claim is unexhausted because McKnight argued to the state courts that the admission of hearsay testimony violated his state law rights. The Court does not address the exhaustion issue because the allegations do not rise to the level of a colorable habeas claim. *See Cassett v. Stewart*, 406 F.3d 614, 624 (9th Cir. 2005) (federal court may deny unexhausted claim on the merits when it is perfectly clear petitioner does not raise even a colorable federal claim).

First, the claim is not cognizable on federal habeas review because no Supreme Court

authority holds that the admission of prejudicial evidence is a constitutional violation. *See Henry,* 197 F.3d at 1031; *Zapien v. Davis,* 849 F.3d 787, 794 (9th Cir. 2015). Second, as the Court of Appeal reasonably found, there was strong evidence of McKnight's guilt: even if the three eyewitnesses were impeached by contradictory statements given before the trial, all three knew McKnight before the shooting and all three unequivocally identified him as the shooter. *McKnight,* 2016 WL 6124497, at *8. This was strong inculpatory evidence even though the witnesses varied their stories over time. Evidence that McKnight disappeared immediately after the shooting indicated a consciousness of guilt. *Id.* Finally, evidence that McKnight committed the shooting out of revenge for Wortham's alleged shooting of McKnight's associate provided a motive for the shooting. *Id.* Because the jury was presented with strong evidence against McKnight, the admission of the hearsay statements did not render the trial fundamentally unfair.

### 3. Freeway Boys "Gang-Type" Evidence

McKnight argues the admission of "gang-type" evidence in this "non-gang" case violated the California rules of evidence because it was more prejudicial than probative and deprived him of a fair trial. The respondent argues McKnight has failed to state a cognizable federal claim and, even if he has, it is unexhausted because the constitutional claim was not fairly presented to the California Supreme Court. The Court does not address the exhaustion issue because the allegations do not rise to the level of a colorable habeas claim. *See Cassett,* 406 F.3d at 624 (federal court may deny unexhausted claim on the merits when it is perfectly clear petitioner does not raise even a colorable federal claim).

The Court of Appeal summarized the relevant facts of this claim as follows:

> Wortham testified appellant, Andre Glaser, and Taco, among others, were members of the Freeway Boys. Officer Gibbs testified the Freeway Boys was "not a gang affiliation but more of a clique." Another law enforcement witness testified there were no validated street gangs in the Alemany projects in 2002.
>
> Officer Gibbs testified to seeing graffiti on the 500 block of Alemany saying, "Freeway Boys" and "RIP WB," which Gibbs explained was a reference to Jason Glaser, who had been known as "White Boy." Gibbs also saw a man on the 500 block of Alemany wearing a t-shirt saying, "Freeway Boys." Gibbs further testified

that on March 20, 2002, on the 500 block of Alemany, he came into contact with appellant and Andre Glaser. At that time, Gibbs arrested appellant for a felony drug offense.

In June 2003, appellant mailed a letter from Texas to Justin Wilson, identified by a law enforcement witness as a Freeway Boys member. The letter was written in conversational street slang and Sergeant Kevin Knoble provided a "translation." FN14 In the letter, appellant did not use the term "Freeway Boys," but asked Wilson to say "hi" to Taco and to tell Andre Glaser to contact appellant privately. FN15

14 The trial court designated Knoble as an expert in "the use and meaning of words, phrases and content of letters written in street terminology in . . . the Alemany projects."

15 The letter also included the line, "keep smashin and his foot on those Bustaz necc ya dig," which Knoble interpreted to mean, "keep your foot on our enemies' neck, . . . break the necks of those that aren't our friends."

*McKnight*, 2016 WL 6124497 at *8.

Because the Supreme Court "has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ," *see Henry*, 197 F.3d at 1031 and *Holley*, 568 F.3d at 1101, this claim must be denied since the admission of the Freeway Boys evidence was not contrary to, or an unreasonable application of clearly established Supreme Court. *See* 28 U.S.C. § 2254(d). Furthermore, the evidence was admissible under *Jammal*, 926 F.2d at 920, because it was relevant to show McKnight had a motive for the shooting, that is, to avenge the murder of another Freeway Boys member.

## II. Prosecutorial Misconduct

McKnight argues the prosecutor committed misconduct by arguing in his rebuttal to the jury that the identification of Tee Baby in the police broadcast was evidence that McKnight was the shooter.[1]

### A. Background

In his closing argument, defense counsel emphasized the limited purpose of the crime

---

[1] In his state appeal, McKnight asserted several grounds for prosecutorial misconduct. This is the only ground raised in his federal habeas petition.

scene identifications reminding the jurors that the judge ruled the evidence was admitted only to

show what the police did, not for the truth of what was stated in the identifications.  *See* ECF No.

20-8 at 180 (defense closing).  In rebuttal, the prosecutor stated:

> By 3:40, Officer Lui is responding . . . . He arrives at 3:43.  By
> 3:44 Gibbs is given a description of the shooter that goes by the
> name Tee Baby, a black male in all black.

ECF No. 20-8 at 237.  The defense attorney objected, stating: "there is no evidence for the

identity."  *Id.*  The court stated: "Okay.  Ladies and gentlemen, as I have indicated before,

statements of counsel are not evidence.  If you need to verify something the court reporter will

read that portion to you."  *Id.*  The prosecutor then stated:

> And understand, ladies and gentlemen, what I am telling you is
> that this is the person that they're looking for.  This is the suspect
> description that they have.  This is who they are patrolling around
> the area, trying to find, a black male in all-black that goes by the
> name of Tee Baby.  At 3:45 Officer Liu describes the shooter,
> black male, all-black clothes, goes by Tee Baby.

*Id.*

Defense counsel again objected because the testimony was admitted only to show the

effect on the listener, not as proof of identity.  *Id.* at 237-38.  The court again told the jury that

statements of counsel are not evidence.  *Id.* at 238.

The prosecutor then stated:

> What it shows is who they're looking for.  That's what it shows.  It
> doesn't show that he was the person who did it; what is shows is
> who they're looking for.  That's why it's important in terms of their
> state of mind.  This is who they are searching for.

*Id.*

Defense counsel asked for a continuing objection, which the court sustained.  When the

prosecutor continued to talk about the identifying information, defense counsel objected again.

The court told the jury, "Ladies and gentlemen, again, this - - a lot of this information, it is up to

you – was offered only for – to show that the subsequent acts and what the police officers were

looking, the intent of the police officers; not for the truth of the matter stated."  *Id.* at 239.  The

prosecutor then stated:

> So, again, what I'm trying to impress upon your minds as jurors is that this Tee Baby is who the cops were looking for, a black male adult, Tee Baby in all-black or in gray sweats, and that they are actively searching for that person. And the reason it's significant is because within five minutes, five minutes of Gibbs arriving on the scene, they're looking for a suspect that fits that description.
>
> And, in fact, the only thing that caused the case not to be made any sooner is the defendant's own conduct of leaving the state. But his case was made within that five-minute period of time. And then we have the identifications. And that's what I'm asking you to base your verdict on, is the identifications that were made by the three witnesses, by Mr. Hoskins, by Mr. Wortham, as well as Ms. Willingham.

*Id.* at 239.

The Court of Appeal acknowledged that some of the prosecutor's statements improperly relied on the evidence to support the truth of the identification but held that the trial court's admonitions to the jury and the prosecutor's own statement that he was relying on the identification of the three testifying witnesses rendered the error harmless. *McKnight*, 2016 WL 6124497 at *13.

### B. Federal Authority

A defendant's due process rights are violated when a prosecutor's misconduct renders a trial "fundamentally unfair." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986). Under *Darden*, the first issue is whether the prosecutor's remarks were improper; if so, the next question is whether such conduct infected the trial with unfairness. *Tan v. Runnels*, 413 F.3d 1101, 1112 (9th Cir. 2005). Factors which a court may take into account in determining whether misconduct rises to a level of due process violation are: (1) the weight of evidence of guilt, *see United States v. Young*, 470 U.S. 1, 19 (1985); (2) whether the misconduct was isolated or part of an ongoing pattern, *see Lincoln v. Sunn*, 807 F.2d 805, 809 (9th Cir. 1987); (3) whether the misconduct relates to a critical part of the case, *see Giglio v. United States*, 405 U.S. 150, 154 (1972); and (4) whether a prosecutor's comment misstates or manipulates the evidence, *see Darden*, 477 U.S. at 182. When a curative instruction is issued, a court presumes that the jury has disregarded inadmissible evidence and that no due process violation occurred. *Greer v. Miller*, 483 U.S. 756,

766 n.8 (1987). Even if prosecutorial misconduct occurs, relief cannot be granted unless the error had a substantial and injurious effect or influence in determining the jury's verdict. *Brecht*, 507 U.S. at 637-38.

## C. Analysis

The challenged remarks can be characterized as prosecutorial misconduct because they meet the requirements set forth in *Darden*. First, the remarks were part of an ongoing pattern in that the prosecutor kept repeating the statements about the shooter's early identification even after defense counsel made several objections. Second, the misconduct relates to a critical part of the case because the main issue in the case was the identity of the shooter. Third, the prosecutor's comments misstated the evidence because he used them for the improper purpose of arguing the identity of the shooter was known moments after the shooting.

Although the prosecutor committed misconduct by repeating the challenged statements, habeas relief is not available unless the misconduct had a substantial and injurious effect or influence in determining the jury's verdict. *See Brecht*, 507 U.S. at 637-38. For this analysis, the Court must determine the strength of the prosecutor's case against McKnight. As stated previously, the main evidence against McKnight was the testimony of the three eyewitnesses who identified McKnight as the shooter, but who gave inconsistent statements to the police and inconsistent testimony at the preliminary hearing. However, even with the inconsistencies, the fact that each of the eye-witnesses knew McKnight from previous encounters with him made their testimony compelling. The testimony of Willingham was particularly powerful because she did not know McKnight personally and, therefore, had no motive to implicate him. The additional evidence that the Freeway Boys, who McKnight was associated with, thought Wortham was involved in the killing of one of their members provided a likely motive for the shooting. And, the jury could reasonably have inferred consciousness of guilt from the evidence that McKnight left the area after the shooting. Therefore, the inculpatory evidence against McKnight was strong. Also, the fact that the trial court gave curative instructions presumably means the jury disregarded the improper statements. *See Greer*, 483 U.S. at 766 n.8 (jury is

presumed to follow court's instructions) and *Darden*, 477 U.S. at 182 (jury is presumed to follow instructions given to it).

Therefore, even if the challenged statements constituted prosecutorial misconduct, they did not have a substantial or injurious effect or influence on the jury's verdict.

## III. Exclusion of One of Hoskins's Convictions

McKnight argues he was deprived of a fair trial by the exclusion of one of Hoskins's prior convictions for the sale of base cocaine because its exclusion limited defense counsel's ability to impeach an eye witness.

The trial court allowed the defense to impeach Hoskins with his convictions of a residential burglary in 2004 and possession of an assault rifle in 2006 and that he gave false information about his identity to a police officer in 1997. *McKnight*, 2016 WL 6124497, at *9. However, the court ruled that a 1995 conviction for sale of a controlled substance was too remote in time to be relevant. *Id.*

The Confrontation Clause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish. *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985) (per curiam). Trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose "reasonable limits on cross-examinations based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986). The Supreme "Court has never held that the Confrontation Clause entitles a criminal defendant to introduce extrinsic evidence for impeachment purposes." *Nevada v. Jackson*, 569 U.S. 505, 511 (2013).

To the extent McKnight argues the exclusion of the 1995 prior conviction was a violation of California law, his claim is denied because habeas proceedings only address violations of the Constitution and laws of the United States. To the extent that McKnight argues the exclusion of the prior conviction violates his confrontation rights, it is denied because the Supreme Court has not ruled that the Constitution entitles a defendant to the admission of extrinsic evidence to

impeach a witness. *See Jackson*, 569 U.S. at 511. Therefore, the state court's denial of this claim is not contrary to or an unreasonable application of Supreme Court authority.

## IV. Second Degree Murder Jury Instruction

McKnight argues that the trial court's "failure to instruct on second degree murder deprived him of a fair trial and the right to jury determination of his guilt or innocence." Petition at 30. In particular, he argues that the court modified the CALCRIM instructions in such a way that it removed second degree murder as the default form of an unlawful killing committed with malice aforethought. McKnight argues the following revised jury instruction is the proper instruction: "If you decide that the defendant committed murder, it is murder of the second degree, unless the People have proved beyond a reasonable doubt that it is murder of the first degree. . . .The People have the burden of proving beyond a reasonable doubt that the killing was first degree murder rather than a lesser crime. If the People have not met this burden, you must find the defendant not guilty of first degree murder and the murder is second degree." *McKnight*, 2016 WL 6124497 at *10.

### A. Instructions Given to the Jury

The jury was instructed as follows on the murder charge:

> The Defendant is charged in count one with murder, in violation of Penal Code § 187. To prove the defendant is guilty of this crime, the People must prove, one, the defendant committed an act that caused the death of another person;

> And, two, when the defendant acted, he had a state of mind called malice aforethought.

> There are two kinds of malice aforethought: Express malice and implied malice. . . . Proof of either is sufficient to establish a state of mind required for murder.

> The Defendant acted with express malice if he unlawfully intended to kill.

> The Defendant acted with implied malice if he intentionally committed an act, the natural and probable consequences of the act were dangerous to human life. And at the time he acted he knew his act was dangerous to human life, and he deliberately acted with conscious disregard for human life.

Malice aforethought does not require hatred or ill will towards the victim. It is a mental state that must be formed before the act that causes death is committed. It does not require deliberation or the passage of any particular period of time.

An act causes death if death is a direct, natural and probable consequence of the act, and the death would not have happened without the act.

A natural and probable consequence is one that a reasonable person would know is likely to happen if nothing unusual intervenes.

In deciding whether a consequence is natural and probable, consider all the circumstances established by the evidence.

If you decide the defendant committed murder, you must then decide whether it is murder of the first degree or second degree.

Defendant has been prosecuted for first degree murder under two theories: The murder was willful, deliberate and premediated;

And, two, the murder was committed by lying in wait.

Each theory of first degree murder has different requirements, and I will instruct you on both.

You may not find the defendant guilty of first degree murder unless all of you agree that the People have proved that the defendant committed murder. But all of you do not need to agree on the same theory.

[Instructions on specific elements of premeditation and lying in wait]

The requirements for second degree murder based on express or implied malice are explained in instruction number 520, which is the one right before this.

For second degree murder with malice aforethought,

The People have the burden of proving beyond a reasonable doubt that the killing was the first degree murder rather than a lesser crime.

If the People have not met this burden, you must find the defendant not guilty of first degree murder.

ECF No. 20-8 at 137-40.

## B. Federal Authority

To obtain federal habeas relief for errors in the jury charge, a petitioner must show that

the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process. *Estelle v. McGuire*, 502 U.S. at 72; *Cupp v. Naughten*, 414 U.S. 141, 147 (1973). The instruction may not be judged in artificial isolation but must be considered in the context of the instructions as a whole and the trial record. *Estelle*, 502 U.S. at 72. In other words, the court must evaluate jury instructions in the context of the overall charge to the jury as a component of the entire trial process. *United States v. Frady*, 456 U.S. 152, 169 (1982). In reviewing an ambiguous instruction, the inquiry is not how reasonable jurors could or would have understood the instruction as a whole; rather, the court must inquire whether there is a "reasonable likelihood" that the jury has applied the challenged instruction in a way that violates the Constitution. *Estelle*, 502 U.S. at 72 & n.4; *Boyde v. California*, 494 U.S. 370, 380 (1990).

### C. Analysis

Although the revised instructions McKnight submits would have told the jury more clearly how it was to determine whether the murder was in the first or second degree, there was not a reasonable likelihood that the jury applied the given instructions in a way that violated the Constitution. The jury was given all the elements of murder and told, if it found that murder was committed, it must decide whether it was first or second degree. The jury was also told that, if the prosecutor did not prove the elements of first degree murder beyond a reasonable doubt, it could not find McKnight guilty of first degree murder and directed the jury to the instruction for second degree murder based on express or implied malice. Thus, the jury was adequately, though rather inelegantly, told that if it found McKnight committed murder, it must find him guilty of second degree murder if the prosecutor did not prove the elements of first degree beyond a reasonable doubt.

### V. Lying-in-Wait Instruction

The jury was instructed on two theories of first degree murder: premeditation and lying-in-wait. McKnight argues the first degree murder conviction must be reversed because there was insufficient evidence to support the lying-in-wait instruction.

The respondent argues that this claim is unexhausted because McKnight did not cite

Federal authority in his petition to the California Supreme Court. The Court does not address the exhaustion issue because the allegations do not rise to the level of a colorable habeas claim. *See Cassettt*, 406 F.3d at 624 (federal court may deny unexhausted claim on the merits when it is perfectly clear petitioner does not raise a colorable federal claim).

Where jurors have been given a factually inadequate theory of guilt, there is no constitutional error because they are well equipped to analyze the evidence; their own intelligence and expertise will prevent them from making that error. *Griffin v. United States*, 502 U.S. 46, 59 (1991); *see also Bolton v. McEwen*, 2011 WL 5599712, *9 (N.D. Cal. Nov. 17, 2011) (citing *Griffin* for proposition that giving an instruction which is not supported by the evidence is not a constitutional violation). Therefore, even if no evidence supported the lying-in-wait instruction, a constitutional violation did not occur.

## CONCLUSION

For the foregoing reasons, the petition is denied. A certificate of appealability will issue on the claims of prosecutorial misconduct and the second degree murder instruction. *See* 28 U.S.C. § 2253(c). A certificate of appealability will not issue on the other claims because they are not ones where "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). The Clerk shall enter judgment in favor of the respondent and close the file.

**IT IS SO ORDERED.**

Dated: August 1, 2019

_____

VINCE CHHABRIA
United States District Judge